Joe C. CLINTON

v.

UNITED STATES of America.

Civ. A. No. TX–79–33–CA.

United States District Court,
E. D. Texas,
Texarkana Division.

Jan. 8, 1982.

Larry Hayes, Paula Fisette, Law Offices of Windle Turley, P.C., Dallas, Tex., for plaintiff.

William J. Cornelius, Jr., First Asst. U. S. Atty., Beaumont, Tex., for defendant.

MEMORANDUM OPINION *

JOE J. FISHER, District Judge.

This is a swine-flu vaccination case before the Court on the issue of liability. Jurisdiction is based on 28 U.S.C. § 1346(b), 28 U.S.C. § 2675 and 42 U.S.C. § 247b(k). Judge Steger bifurcated the trial, and the parties presented evidence on the liability issue to the Court on October 27, 1981.

The plaintiff Joe C. Clinton was inoculated with a swine flu vaccination on December 15, 1976 in Hopkins County, Texas. Within 72 hours, he began to experience symptoms which he claims evidence the disease of Guillain-Barre Syndrome, and which the government claims is partial myelopathy, a central nervous system disorder affecting the spinal cord. The government apparently concedes that if the Court finds that the plaintiff contracted Guillain-Barre Syndrome (GBS), and that it was causally related to the swine flu shot, then liability has been established.

The plaintiff is an 85 year old male who, until he received the shot, was an active house painter. Three days after the shot, the plaintiff experienced tingling, paralysis, numbness, pain and weakness in the lower half of his body. He was first seen by his family physician, Dr. Max Latham, in February, 1977. Dr. Latham thought the symptoms indicated a vascular problem and referred the plaintiff to a vascular specialist. The specialist found no vascular problems. Dr. Latham then referred the plaintiff to a neurologist, Dr. Jenike, who diagnosed the plaintiff as having peripheral neuropathy, a condition in which the nerve fibre or its insulating cover is destroyed. GBS is a form of peripheral neuropathy. One of the symptoms noted by Drs. Jenike and Latham was motor weakness in the lower extremities. The plaintiff was hospitalized in October, 1977, for pain, and in

---

* This Memorandum Opinion constitutes the Findings of Fact and Conclusions of Law re- quired by Rule 52, F.R.Civ.P.

November, 1977, for episodes of falling and numbness. On October, 1977, Dr. Latham reported that the plaintiff's deep tendon reflexes were 1 on a scale of 1 to 4, which was considered both abnormal yet good. Mr. Clinton was diagnosed in November, 1977, as having GBS. Dr. Latham's opinion was that plaintiff's GBS was permanent.

The plaintiff was examined by Dr. Robert Fry in the spring of 1980. Dr. Fry did a neurological exam which found decreased reflexes and "sensory changes in the lower extremities." His final diagnosis was "organic heart disease with angina, hypertension which was controlled, and ascending myelitis from a Guillian-Barre like syndrome from swine flu vaccine." Deposition of Dr. Fry at 11. The plaintiff had a heart attack in March, 1981, and was hospitalized. Dr. Fry stated that he had pain in his lower extremities and decreased reflexes throughout as well as "hypesthesis" (decreased ability to feel). Dr. Fry's conclusion was that plaintiff suffered from GBS.

Dr. Lester Collins III examined Mr. Clinton in March, 1981, at the request of the defendant. Dr. Collins, like Dr. Jenike and unlike Drs. Fry and Latham, is a neurologist. He was of the opinion that the plaintiff suffered not from GBS or peripheral neuropathy, rather, from "transverse myelitis." His conclusion was based on his observation that the plaintiff lacked the two symptoms required for a GBS diagnosis. These were progressive motor or muscle weakness and loss of reflexes (areflexia). Dr. Collins stated that the plaintiff showed three symptoms which cast doubt on the diagnosis of GBS, namely, severe sensory loss with pain, central nervous system involvement, and sharp sensory level.

The parties and medical experts were somewhat in agreement on the criteria for diagnosing GBS. These are embodied in *Criteria Established for Guillain-Barre Diagnosis* published by the National Institute for Neurological and Communicative Diseases and Stroke (NINCDS) (hereafter *Criteria*). Two features are required for diagnosis:

A. Progressive motor weakness of more than one limb.

The degree of weakness ranges from minimal weakness of the legs with or without mild ataxia [unsteadiness] to total paralysis of the muscles of all four extremities and trunk, bulbar and facial paralysis, and external opthalmoplegia.

B. Areflexia (loss of tendon jerks).

Universal areflexia is the rule, although distal areflexia with definite hyporeflexia of the biceps and knee jerks will suffice if other features are consistent.

*Criteria* at 2–3.

The evidence showed that the plaintiff experienced some motor weakness in the lower half of his body. This was demonstrated by his difficulty walking, standing and especially, getting up. Drs. Collins, Leimann and Jenike, however, found no significant motor weakness in the plaintiff. Drs. Fry and Latham were of the opinion that he did have motor weakness.

The Court finds that the plaintiff did have motor weakness in the lower half of his body following the shot. This finding is based on the evaluation of the plaintiff's testimony, which the Court finds credible, and the opinions of the two treating physicians. The defendant points out that the symptoms of motor weakness in the plaintiff could be caused by other factors, such as pain. The mere argument that the outward signs of motor weakness could have other causes does not convince the Court that plaintiff does not have some degree of motor weakness, especially in light of the testimony to the contrary.

Areflexia or loss of tendon jerks is the second symptom required for a diagnosis of GBS. The evidence showed that the plaintiff had areflexia of the ankle joints, a condition which according to Dr. Collins is not uncommon in 85 year old men. Dr. Latham's tests showed, at least, diminished tendon reflexes. He tested and rated them as 1 on a scale of 1 to 4.

The evidence showed that the plaintiff has some loss of tendon reflexes, limited to the lower half of his body, but that he did

not have "universal areflexia" at the time the doctors examined him. One possible reason for this is that he had regained some his reflexes before he was tested, as he was not immediately diagnosed as having GBS. Recovery in GBS usually starts about eight weeks after the shot, *see Criteria* at 3. The plaintiff was not examined until over eight weeks after he received the shot. Thus, the Court finds that the plaintiff did have areflexia of the ankle joints and hyporeflexia (decreased reflexes) in other joints.

Of the "features strongly supportive of diagnosis" listed in *Criteria*, the plaintiff had the first three (ranked in order of importance). These were:

1. Progression. Symptoms and signs of motor weakness progress rapidly but cease to progress by four weeks into the illness . . . .

2. Relative symmetry . . . .

3. Mild sensory symptoms or signs.

There is no dispute that plaintiff showed progression and symmetry. He had sensory signs, but they were more than mild, however. In fact, the major symptoms of his illness were sensory in nature.

The plaintiff also had some of the "variant" features listed in *Criteria.* These include severe sensory loss with pain and permanent residual deficit. There was some dispute over whether the plaintiff had central nervous system involvement, the plaintiff's experts saying that he did not, and the defendant's experts claiming that he did, but that it was not from GBS and not a feature of GBS. Defendant's expert Dr. Collins believed that the variant features cast doubt on a GBS diagnosis, but it appears that rather than cast doubt, they are consistent with the disease, although not the common symptoms.

The plaintiff showed none of the features which rule out GBS, but had one symptom which "cast[s] doubt on the diagnosis," *see Criteria* at 6, that being "sharp sensory level."

The defendant's theory of the case is that the plaintiff has partial myelopathy and not GBS, and the theory is based on the fact that plaintiff's symptoms were mainly sensory, i.e., pain, burning, tingling, decreased ability to feel, decreased vibratratory sensation. The Court finds, however, that the plaintiff has met his burden of proving that he has GBS. Of the two neurologists who examined the plaintiff, one felt that he had peripheral neuropathy (of which GBS is a form). The treating physicians, although not neurologists, believed that plaintiff had GBS. They observed the plaintiff over a period of time, starting when he received the shot. The defendant's expert saw the plaintiff only once in March, 1981, four and one half years after the shot and four years after recovery usually begins. The final factor is that the symptoms commenced within 72 hours after the plaintiff received the vaccination.

The Court further finds that the GBS was caused by the swine flu shot given to the plaintiff on December 15, 1976. The issue of damages being left for a later time, the Court now finds that the United States is liable for the injuries suffered by the plaintiff, as he has proved by a preponderance of the evidence that he has GBS caused by the swine flu vaccine.